UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOY LAIL,
KRISTINA STODDARD,
RONALD AZUCENAS,
TAL-BETH COHEN,
MARCELA DIAZ,
BENJAMIN FUTCH,
DENISE FUTCH,
NAJAH GARMO,
RANDY HALL,
TYLER HALL,
ROBERT HARMON,
MICHAEL HERMANSON,
BENNY HERNANDEZ,
ERNEST HUNTER,
MAURITZIO LEVIN,
DAVID LINDER,
MARK MICHAELSON,
JAMES MILLER,
JOSEPH NAPIER,
LYDIA NAPIER (f/ka/ Lydia Corcoran),
ERIC PEHMOELLER,
VICKI PEHMOELLER,
SCOTT WARRINGTON,
WILLIAM WOLFE, and
ROBERT WEAVER,

Case No.:

    *Plaintiffs,*

    v.

MIAMI AIR INTERNATIONAL, INC.,

    *Defendant.*
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Joy Lail, Kristina Stoddard, Ronald Azucenas, Tal-Beth Cohen, Marcela Diaz, Benjamin Futch, Denise Futch, Najah Garmo, Randy Hall, Tyler Hall, Robert Harmon, Michael Hermanson, Benny Hernandez, Ernest Hunter, Mauritzio Levin, David Linder, Mark Michaelson, James Miller, Joseph Napier, Lydia Napier (f/k/a Lydia Corcoran), Eric Pehmoeller, Vicki Pehmoeller, Scott Warrington, William Wolfe, and Robert Weaver, sue Defendant, Miami Air International, Inc., (hereinafter, "Miami Air"), and allege as follows:

## Jurisdictional Allegations

1. This action arises out of a May 3, 2019, commercial airplane crash in Jacksonville, Duval County, Florida following an international charter flight from Naval Station Guantanamo Bay, Cuba, to Naval Air Station Jacksonville, U.S.A.

2. This action is governed by the Convention for the Unification of Certain Rules for International Carriage by Air (hereinafter, "The Montreal Convention").

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises out of a treaty of the U.S.A.

4. The Montreal Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward, so long as that carriage occurs between two countries that are signatories to The Montreal Convention.

5. Both the U.S.A. and Cuba are signatories to The Montreal Convention.

6. Naval Station Guantanamo Bay is a military base operated by the U.S.A.

7. While the U.S.A. has complete control over Naval Station Guantanamo Bay, the leased land there remains within the ultimate sovereignty of Cuba.

8. At all times herein mentioned, Miami Air is a for profit corporation organized under the laws of the State of Florida.

9. As of May 3, 2019, Miami Air was common carrier for hire engaged in the transportation of charter airline passengers in both domestic and international air travel from its principal place of business located at 5000 NW 36th Street, #307, Miami, Florida 33166.

10. This Court has general and specific personal jurisdiction over Miami Air because Miami Air's principal place of business, at the time of the accident at issue, was in Florida. Moreover, Miami Air has sought and continues to seek the protection of the Bankruptcy Court in the Southern District of Florida.

11. Each Plaintiff named herein has been granted a relief from the automatic stay resulting from Miami Air's bankruptcy petition.

12. This Court is a proper venue for this action pursuant to Article 33 of The Montreal Convention because Jacksonville, Florida was the place of destination of the Miami Air flight which is the subject of this case.

13. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391, because

the crash and a substantial portion of the events and omissions occurred in Jacksonville, Florida.

## General Allegations

14. At all times material, Miami Air owned, operated, managed, controlled, serviced, maintained, flew, and supervised a 2001 Boeing 737-81Q model airplane bearing Federal Aviation Administration (FAA) registration N732MA.

15. On May 3, 2019, Miami Air dispatched N732MA for an international flight from Leeward Point Field in Guantanamo Bay Cuba to Naval Air Station Jacksonville ("NAS JAX") as Flight 293.

16. Flight 293 was a commercial flight operating pursuant to 14 CFR §121 of the Federal Aviation Regulations and was being flown under Instrument Flight Rules.

17. At all material times, the agents, dispatchers, pilots and other flight crew, officers, mechanics, supervisors, ground crew and management personnel involved with Flight 293 were employees of Miami Air, acting within the course and scope of their employment.

18. Under FAA Regulations, pilots are required to conduct a preflight investigation of the aircraft, current weather information, forecast weather information and airport conditions for all airports of intended departure and landing.

19. The FAA warns pilots to maintain 20 miles separation from any thunderstorm.

20. At the time of Flight 293's departure, the potential for building thunderstorms in the Jacksonville area was forecast.

21. Flight 293 was occupied by 136 passengers and 7 crew members, including James Miller.

22. Due to mechanical problems, the departure of Flight 293 was delayed more than four hours.

**The Flight**

23. Miami Air Flight 293 departed from Cuba and proceeded in a northerly direction towards Jacksonville.

24. Mechanical problems prevented Flight 293 from climbing to its best fuel economy cruising altitude of between 25,000 and 32,000 feet.

25. Flight 293 remained at an altitude of only about 17,000 feet, which required far more fuel consumption than if it climbed to its best fuel economy altitude.

26. Passengers aboard Flight 293 experienced high cabin temperatures due to the inoperable air conditioning system.

27. As Flight 293 approached the Jacksonville area, its flight crew communicated with air traffic controllers located at Jacksonville Approach, an FAA

radar facility that provides separation and weather services to pilots about the conditions at Jacksonville area airports, including NAS JAX.

28. The prevailing winds at NAS JAX were out of the West at about 290° at 8 knots, gusting to 16 knots, which favored landing on Runway 28.

29. Runway 28 at NAS JAX is a paved, 9,000-foot-long runway which is oriented to the West with the opposite direction being Runway10, which is oriented to the East.[1] Because of a displaced threshold for military jet arresting gear at the West end of the runway, the available landing distance was only 7,800 feet.

30. Prior to Flight 293's arrival to NAS JAX, controllers warned the flight crew that there was moderate to heavy precipitation on the final approach to Runway 28.

31. The flight crew asked controllers about Runway 10 and were told that it also showed moderate to heavy precipitation, and storms were building at about the five-mile final approach.

32. With this information, the flight crew elected to continue towards Runway 28.

33. As Flight 293 was cleared to descend to an altitude of 5,000 feet, the

---

[1] Runways are oriented to their magnetic heading in the direction an aircraft would be landing. For example, at NAS JAX, a pilot landing on Runway 28 would be heading approximately 280°. Those landing on the opposite end, Runway 10, which is the same pavement as Runway 28, would be heading 110°.

controllers warned the flight crew that controllers at NAS JAX's air traffic control tower had reported that "both runways look pretty bad."

34. Controllers further reported convective thunderstorm activity, phrased as "moderate to heavy precipitation," on both sides of the airport.

35. Despite this warning, the flight crew elected to proceed to NAS JAX, rather than to divert to an alternate airport or to hold while the thunderstorm activity moved or dissipated.

36. After clearing Flight 293 to descend to an altitude of 3,000 feet, controllers asked if the pilots would prefer Runway 10, advising that it looks "best."

37. The wind conditions also created a 15-knot tailwind condition for aircraft landing on Runway 10, which would increase the required landing distance for Flight 293.

38. Despite the shorter runway and tailwind, the flight crew advised controllers of their decision to divert to Runway 10 and began making a series of assigned turns to align the aircraft to the runway.

39. About 10 miles out, controllers instructed the flight crew to contact Navy controllers at NAS JAX and issued a clearance for the final approach.

40. At the time, there was an active thunderstorm directly over the airport causing moderate to heavy rain and standing water on the pavement.

41. When Flight 293 arrived at Runway 10 at about 9:49 p.m. local time,

the airplane was too high, too fast, and right of the runway's centerline.

42. Flight 293 touched down with an airspeed of about 200 miles-per-hour, which is about 25 miles-per-hour faster than appropriate.

43. During its travel down the runway, the flight crew was unable to appreciably slow the aircraft or come to a stop before the runway's end due to the excessive speed, the tailwind condition and the lack of working thrust reversers.

44. As it neared the end of the runway, the flight crew lost control of the aircraft, allowing it to veer off the paved runway.

45. The flight crew never warned the passengers of Flight 293 to brace for the imminent impact.

46. The airplane crashed through a rock wall or berm at the end of the runway and came to an abrupt final stop when it impacted water in the St. Johns River.

## COUNT I

### *Strict Liability under Montreal Convention*

Plaintiffs re-allege, and incorporates by reference, the allegations set forth in paragraphs one (1) through forty-six (46) above, and allege further:

47. Miami Air's liability is governed by Articles 17, 21 and 24 of the Montreal Convention.

48. Plaintiffs sustained injuries while passengers on Flight 293 as the

result of an "accident" within the meaning of the Montreal Convention.

49. Under Article 21 and the Inflation Adjustments effective as of December 2019, Miami Air is strictly liable for Plaintiffs' damages arising out of bodily injury and caused by the accident described herein, up to a value of 128,821 Special Drawing Rights (SDR).

50. Under Article 17 and the Inflation Adjustments effective as of December 2019, Miami Air is strictly liable for Plaintiffs' damages arising out of destruction, loss, or damage to Plaintiffs' baggage, up to a value of 1,288 SDRs, to the extent Miami Air has not already compensated certain Plaintiffs for these damages.

51. Under Article 21, Miami Air is liable for all of Plaintiffs' damages, regardless of the amount, unless Miami Air proves that a) such damage was not due to the negligence or other wrongful act or omission of Miami Air or its servants or agents; or b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

52. As a direct and proximate result of the accident, Plaintiffs have suffered bodily injuries and have been forced to incur the expenses of medical care, nursing care and treatment, disability, pain, suffering, mental anguish, embarrassment, inconvenience, loss of earnings, loss of the ability to earn money, loss of capacity for the enjoyment of life, and aggravation of previously existing conditions.

53. Plaintiffs' injuries are continuing, and Plaintiffs will suffer from these injuries, damages and losses in the future.

WHEREFORE, Plaintiffs, Joy Lail, Kristina Stoddard, Ronald Azucenas, Tal-Beth Cohen, Marcela Diaz, Benjamin Futch, Denise Futch, Najah Garmo, Randy Hall, Tyler Hall, Robert Harmon, Michael Hermanson, Benny Hernandez, Ernest Hunter, Mauritzio Levin, David Linder, Mark Michaelson, James Miller, Joseph Napier, Lydia Napier (f/k/a Lydia Corcoran), Eric Pehmoeller, Vicki Pehmoeller, Scott Warrington, William Wolfe, and Robert Weaver, demand judgment against Defendant Miami Air International, Inc., for all damages permitted by law, costs of this action, and a trial by jury on all issues.

Respectfully submitted this 15th day of April, 2021.

SPOHRER & DODD, P.L.

/s/  Keith L. Maynard
**Robert F. Spohrer, Esq.**
Florida Bar No. 184500
**Galen D. Bauer, Esq.**
Florida Bar No. 14156
**Keith L. Maynard, Esq.**
Florida Bar No. 36214
76 S. Laura Street, Suite 1701
Jacksonville, FL 32202
Tel: (904) 309-6500
Fax: (904) 309-6501
rspohrer@sdlitigation.com
gbauer@sdlitigation.com
kmaynard@sdlitigation.com
*Attorneys for Plaintiffs*